UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANTHONY RENNIE JONES a/k/a RENNIE ANTHONY JONES,

Defendants.

Case No. 1:25-cr-00042-DCN

**MEMORANDUM DECISION AND ORDER**

## I. INTRODUCTION

Before the Court are five motions filed by the Defendant, Anthony Jones. These include two Motions to Dismiss (Dkts. 60, 63), two Motions to Suppress (Dkts. 62, 64), and a Motion for Return of Property (Dkt. 61). The Government opposes all motions.

Having reviewed the record and briefs, the Court finds the facts and legal arguments are adequately presented. Accordingly, the Court will forgo oral argument or an evidentiary hearing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *United States v. Howell,* 231 F.3d 615, 620 (9th Cir. 2000) ("An evidentiary hearing . . . need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist.")

Each motion will be addressed below except the first Motion to Dismiss. That Motion will be addressed in a separate sealed order because it contains a discussion about grand jury testimony. In sum, all of Jones's Motions are DENIED.

## II. BACKGROUND

On August 3, 2013, Jones pleaded guilty to Distribution of Methamphetamine, a violation of 21 U.S.C. § 841(a)(1), in Case No. 1:13-cr-00064.[1] On June 3, 2014, Judge Edward J. Lodge sentenced Jones to 84 months of incarceration followed by four years of supervised release.[2]

Upon completion of his term of incarceration, Jones was discharged from prison and began his supervised release on September 19, 2019. As a condition of his supervised release, Jones was subject to a condition which stated, "The defendant shall submit his or her person, property, house, residence, vehicle, papers, or office, to a search conducted by a United States probation officer." Case No. 13-cr-00064, Dkt. 69, at 4.

Within one month of beginning supervision, Jones began violating the conditions of his supervision by consuming alcohol. After a demonstrated pattern of noncompliance, including multiple failures to submit for urinary analysis, failures to submit monthly reports, and continued alcohol use, Jones's probation officer began conducting surveillance at Jones's residence. Jones's probation officer also began conducting unannounced home visits after observing Jones driving without a valid driver's license (which he has been convicted of sixteen times).

On one such visit, in response to yet another missed urinary analysis appointment, Jones's probation office discovered 39 grams of cocaine. As a result of the search, the

[1] In that case, Jones repeatedly sold methamphetamine to confidential informants at his place of employment—The Hookup Barbershop in Nampa, Idaho. A subsequent search of The Barbershop revealed $14,901 in cash, drug paraphernalia, and directions for cooking methamphetamine.

[2] When Judge Lodge took inactive senior status, that case was transferred to the undersigned. *See* Case No. 1:13-cr-00064, Dkt. 81.

probation officer confiscated Jones's cellphone, which, when examined later, showed Jones was in regular contact with Norteno gang members and was actively selling cocaine.

On November 4, 2020, Jones admitted to violating the terms of his supervised release. The undersigned sentenced Jones to 36 months of incarceration with three years of supervised release to follow. Jones's conditions of supervision were also amended at that time to include an "Additional Supervised Release Terms" that Jones "shall submit his person, property, house, residence, vehicle, papers, computers . . . other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer." Case No. 13-cr-00064, Dkt. 103, at 5.

On April 18, 2023, Jones began supervised release for a second time.

Within the first year of his second term of supervision, Jones consumed alcohol, failed to report for drug testing, provided a diluted drug test, and failed to submit to a breathalyzer test on 20 occasions.

On September 3, 2024, Jones sold one pound of methamphetamine to a confidential informant during a controlled buy operation. He sold a second pound of methamphetamine to a confidential informant on September 19, 2024, and a third pound of methamphetamine to a confidential informant on October 31, 2024.

In light of Jones's significant compliance issues, Jones's probation officer obtained a GPS vehicle tracker and, with the help of the Nampa Police Department, placed it on Jones's vehicle to monitor his movements. That was in October of 2024. Jones had various interactions with law enforcement over the course of the following months.

Ultimately, on January 9, 2025, Jones's probation officer and law enforcement searched three locations pertaining to Jones.

First, Nampa Police stopped Jones at the request of his probation officer and performed a compliance check. As part of that stop, Jones's car was searched pursuant to the terms of his supervised release. Nothing of interest was located.

Second, after the traffic stop, officers transported Jones to his residence at 18159 Spicebush Avenue, in Nampa ("Spicebush") and searched there—again, pursuant to the terms and conditions of his supervised release. Officers seized various items including guns, phones, and drug paraphernalia.

Third, a warrant was obtained to search another residence located at 724 15th Avenue South, in Nampa. Evidence suggested Jones frequented this house and stored illicit materials there.[3] As part of this search, officers found a Smith and Wesson handgun, a bag of suspected fentanyl pills weighing approximately 643 grams (which is the equivalent of approximately 6,430 pills), various packaging material, multiple scales, various THC vape cartridges, 579 grams of suspected cocaine in brick form, approximately 613 grams of suspected methamphetamine, and an AR-style ghost gun chambered in 9mm.

That day Jones was charged in Canyon County with Drug Trafficking in Cocaine and Unlawful Possession of a Firearm by a Convicted Felon. Canyon County Case No. CR14-25-00802. The Criminal Complaint alleged Jones possessed 400 grams or more of cocaine under Count One and a .45 caliber handgun, under Count Two. No other charges

[3] The Government refers to this location as Jones's "stash house."

were levied against Jones regarding any of the controlled drug purchases mentioned above or any of the additional firearms, methamphetamine, or fentanyl found in the residence.

A month later, on February 11, 2025, Jones was federally indicted on three counts of Distribution of Methamphetamine, one count of Distributing Fentanyl, one count of Possession with Intent to Distribute Methamphetamine, one count of Possession with Intent to Distribute Cocaine, one Count of Possession with Intent to Distribute Fentanyl, and one count of Possession of a Firearm in Furtherance of a Drug Trafficking offense. Dkt. 2. Following Jones's federal indictment, Canyon County dismissed its charges against Jones on February 24, 2025, prior to any judgment on the merits of that case.

Procedurally this case has had some twists and turns. Despite being represented by competent counsel during the entirety of this case, Jones has insisted on filing motions himself. Dkts. 30, 32, 33, 34, 36. The Court struck those motions as inappropriate. Dkt. 35. Jones is also now on his fifth attorney. The Court is aware Jones has endeavored to file motions that are not supported by the facts or the law. As explained below, some of the instant motions fall into that category. The Court recognizes the difficult position these requests place on Jones's counsel.

As part of the continuing saga, Jones filed a Motion to Dismiss and Motion to Suppress earlier this year. Dkts. 46, 47. Jones then entered into a plea agreement with the Government. Dkt. 48. However, Jones never went through with the change of plea hearing, instead requesting a continuance. Dkt. 51.

The Government subsequently filed a Superseding Indictment against Jones. Dkt. 57. Jones has pleaded not guilty to those charges. Dkt. 59.

Jones then withdrew his previously-filed Motion to Dismiss and Motion to Suppress (Dkt. 67), renewed those motions, and filed three additional motions. The Court will discuss each motion—again, except Jones's first Motion to Dismiss—in turn.

## III. DISCUSSION

### A. Motion for Return of Property (Dkt. 61)

#### *1. Introduction*

On January 9, 2025, Detective Mike Coronado of the Nampa Police Department was present for service of the search warrant on the residence at 724 15th Avenue South, in Nampa. He reported finding a duffel bag with a safe inside. Inside the safe, among other things, was a gold Huelga Bird ring.[4] Jones has a tattoo of a Huelga Bird on his chest and the Huelga Bird is associated with the Norteno gang. Because Jones was a suspected member of the Norteno gang, Detective Coronado determined the ring was associated with gang activity and seized it as evidence.

Jones now asks that the Court order the ring be returned to him because the search was unlawful and Detective Coronado's supposition about the ring's connection to gang activity is insufficient to warrant its seizure in the first instance.

#### *2. Legal Standard*

Under Federal Rule of Criminal Procedure 41(g), "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for

[4] Jones's briefing suggests Detective Coronado found the ring at the 724 15th Avenue South residence, but also that Jones's probation officer found the ring at the Spicebush residence. Dkt. 61, at 1–2; *see also* Dkt. 62, at 5 (brief in support of Motion to Suppress suggesting the ring was found at the Spicebush residence). After reviewing the record (*see, e.g.*, Dkt. 61-2) the Court believes the ring was found at the 724 15th Avenue South residence. Any lack of clarity, however, does not alter the Court's conclusion today.

the property's return." However, Rule 41(g) does not apply when property is subject to federal forfeiture. *See United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir. 1996).

*3. Analysis*

First, as will be explained below, each of the searches related to Jones on January 9, 2025, were lawfully executed. Thus, Rule 41(g) does not apply.

Second, Jones was on supervised release at the time of the search. One of his supervised release terms is that he "is prohibited from possessing any items representing or showing affiliation with gangs and shall submit to the seizure of any such contraband." Dkt. 62-2, at 5. Detective Coronado suspected the ring was a violation of Jones's supervised release and seized it. Such was permissible.

Finally, the current case is potentially headed to a jury trial. Any evidence seized from Jones's residence or stash house, especially his personal property found next to controlled substances, is potentially admissible at trial to show knowledge of the controlled substances. As potential trial evidence, the ring cannot be returned to Jones at this time.

The Motion is DENIED without prejudice.

**B. Motion to Suppress (Dkt. 62)**

*1. Introduction*

In this Motion to Suppress, Jones argues five points: (1) a GPS tracker placed on his vehicle constituted a warrantless search; (2) the search of his residence was unlawful and unsupported by probable cause; (3) he invoked his right to remain silent in 2013 and that carried forward into 2024; (4) potential exculpatory evidence regarding fentanyl pills was altered; and (5) his vehicle was stopped by his probation officer without probable cause.

The Court will address each in turn.

*2. Legal Standard*

A criminal defendant may move to suppress evidence. Fed. R. Crim. P. 2(b)(3)(C). When law enforcement violates a defendant's Fourth or Fifth Amendment rights, the exclusionary rule mandates that "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *United States v. Calandra*, 414 U.S. 338, 350 (1974). On a motion to suppress, the defendant bears the ultimate burden of proving a constitutional violation. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

*3. Analysis*

a. <u>GPS Tracker</u>

Due to Jones's significant issues with compliance, his probation officer reached out to the Nampa Police Department in September 2024, with a request that they place a GPS tracking device on Jones's vehicle. In October they did so and the device monitored Jones's movements until the time of his arrest on January 9, 2025.

Jones argues placement of the GPS tracker constituted an unconstitutional warrantless search and that all data from the tracker must be suppressed. He argues tracking his movements was "in no way connected to issues relating to [his] compliance [with his] supervised release terms" and was an invasion of his privacy. Dkt. 85, at 3–4.

The Government counters Jones's privacy rights under the Fourth Amendment were much more limited because he was on supervised release and subject to a term and

condition specifically targeted to search of his person, residence, and vehicle at any time.[5]

In reply, Jones argues he may have been subject to warrantless searches, but a GPS tracker serves a different purpose and cannot be subsumed under that umbrella.

The Court appreciates Jones's argument. The constant monitoring of a person's whereabouts does seem to be somewhat different from a specific search. That said, the Ninth Circuit has concluded that the placement of a GPS tracker on a parolee's car is permissible. In *United States v. Korte*, the Ninth Circuit held that "[i]nstalling a GPS tracker on a car constitutes a search, typically requiring a warrant." 918 F.3d 750, 755 (9th Cir. 2019). The Circuit went on to explain, however, that a warrant was *not* required when the target is on parole or supervised release because those people enjoy less robust protections under the Fourth Amendment. *Id*. at 755–56.[6] Notably, the Ninth Circuit highlighted the fact that tracking those persons who are already being supervised is a "crucial tool" in reducing recidivism, promoting reintegration into society, and deterring criminal conduct. *Id*. This last comment is of particular significance to the Court here.

Jones's history on supervised release is, quite frankly, abysmal. He has consistently returned to criminal activity within weeks or months of being released from incarceration. His probation officer was patient and willing to let minor violations sit idle while hoping Jones would turn the corner. When it became apparent that was not going to happen, his

[5] To his credit, Jones recognizes that his rights are "diminished" because he was on supervised release. Dkt. 85, at 2. Nevertheless, he maintains "some part of that right [under the Fourth Amendment] remains intact" and he had "some expectation of privacy." *Id*.

[6] Jones argues his case is factually distinct from *Korte* because, in that case, the GPS tracker was only active for six days and officers were formally investigating suspected criminal activity. The Court recognizes these factual differences, but finds they do not alter the underlying holding about the propriety of using a GPS tracker without a warrant when monitoring a person already subject to monitoring.

probation officer took additional steps to ensure Jones's compliance and the public's safety.

The Court finds the placement of the GPS tracker on Jones's vehicle without a warrant was constitutionally permissible considering he was on supervision and already subject to terms and conditions consistent with monitoring *and* was consistently non-compliant. This part of the Motion is DENIED.

b. Residence Search

One of the three searches that took place on January 9, 2025, was at Jones's residence at 18159 Spicebush Avenue. Law enforcement initiated the search at the request of Jones's probation officer and without a warrant pursuant to the terms and conditions of Jones's supervised release. Various items of criminal activity were found and confiscated.

Jones now argues the search was impermissible because there was no evidence 18159 Spicebush Avenue was his actual address and the term and condition that allowed warrantless searches only applied to his "United States probation officer;" not other law enforcement officers.

First, 18159 Spicebush is the address the United States Probation Office had in their system for Jones since February 1, 2024. Dkt. 70-1. The first home visit at that location was conducted on February 5, 2024. Additional home visits at that location were conducted on March 11, 2024, May 20, 2024, and July 29, 2024. An additional home visit was attempted on November 12, 2024. It was clearly established 18159 Spicebush was Jones's residence; thus, the search on January 9, 2025, was permissible without a warrant.

Second and relatedly, while Jones's terms and conditions of supervised release stated he must submit to a search of his residence by a "United States probation officer,"

this language is not so limiting as to invalidate the search on January 9, 2025, simply because other officers were involved. This argument is flatly contradicted by caselaw. *See, e.g.*, *United States v. Harper*, 928 F.2d 894, 897 (9th Cir. 1991) ("[P]olice may not use a parole officer as a 'stalking horse' to evade the fourth amendment's warrant requirement. However, police and parole officers are entitled to work together to achieve their objectives; concerted action does not in and of itself make a search constitutionally infirm.") (citation modified); *United States v. Johnson*, 2022 WL 1315305, *1 (9th Cir. 2022) (quoting *United States v. Jarrad*, 754 F.2d 1451, 1454 (9th Cir. 1985)) ("No violation of Fourth Amendment where search was independently initiated by parole officer and other law enforcement became involved after the parole officer's request for assistance."). This portion of Jones's Motion is DENIED.

c. Right to Remain Silent

After his arrest on January 9, 2025, Jones was transported to the Nampa Police Department to be interviewed. The interview was recorded by video and audio. Officers read Jones his Miranda rights, he acknowledged those rights and spoke with the officers. After waiving his Miranda rights, Jones admitted that all the firearms and drugs were his.

Jones now argues he invoked his right to remain silent in his prior case (back in 2013) and that this invocation should carry forward to today and apply to any statements he made to officers on January 9, 2025.

This argument is patently absurd and will be denied outright.[7] There is no caselaw suggesting the invocation of the right to remain silent can be carried forward over a decade after its utterance and apply to different questions regarding different crimes in an entirely different case. This part of Jones's Motion is DENIED.

d. Fentanyl Pills

As part of the search of the residence at 724 15th Avenue South a safe was found. Within the safe were multiple baggies of suspected fentanyl. Apparently, those bags were opened and/or combined into a single bag at some point by law enforcement for testing purposes. Jones argues this means the evidence was tampered with and must be suppressed.

Jones does not call into question the actual search that resulted in the seizure of the suspected fentanyl; only the properness of how the evidence was transported and tested.[8] Such a challenge is better suited for trial. This part of Jones's Motion is DENIED.

e. Vehicle Stop

Finally, Jones claims he was stopped on January 9, 2025, for a nonexistent traffic violation and that the subsequent search of his vehicle far exceeded the bounds of a probationary search. He further alleges his being transported to the Spicebush residence was an impermissible continuation of the same warrantless stop.

---

[7] The Government seeks sanctions against Jones's counsel for filing this motion. The Court is of the opinion that Jones himself is the moving force behind many of these motions and arguments. While that does not absolve counsel of his professional and ethical duty to be a gatekeeper of Jones's arguments, the Court understands the attorney/client relationship can be complicated and will not impose sanctions at this time.

[8] Jones suggests that opening bags was inconsistent with the Nampa Police Department's "internal policy" and references a photograph. Dkt. 9-9. This photograph is of the fentanyl pills (in various baggies), a scale, and a placard including "best practices" for booking evidence. *Id*. Whether these practices are actual policy is unknown. Regardless, this is something that can be fleshed out at trial as part of the chain of custody and sufficiency of the evidence.

Pursuant to 18 U.S.C. § 3606, a probation officer is empowered to arrest a convicted person serving a term of supervised release, with or without a warrant, "[i]f there is probable cause to believe that [the offender] has violated a condition of his probation or release." As detailed above, Jones's probation officer had probable cause to believe Jones had violated the conditions of his supervised release for numerous reasons and further, that he was actively engaged in criminal activity. Thus, regardless of whether there was any actual traffic violation, if his probation officer had probable cause, Jones could be stopped at any time. Here, that is what happened.[9] Importantly, Jones was informed at the traffic stop that he was not under arrest, but only detained, and could remain there or accompany the probation officer to be present during the search of his residence. Jones indicated he wanted to be transported to his residence to be present during the search. He was later arrested *after* the search of his residence.

The search of the residence was also conducted pursuant to the terms and conditions of Jones's supervised release which have already been outlined multiple times. There is no credible argument that the search of the residence was unconstitutional, in itself, or as in extension of an impermissible traffic stop—because the stop was constitutional.[10] Jones being stopped and the subsequent search of his vehicle and residence were conducted in accordance with the terms and conditions of his release and were constitutional. This

---

[9] And, as detailed above, that Jones's probation officer enlisted the assistance of local law enforcement does not negate the efficacy of the stop.

[10] Jones takes specific issue with his probation officer confiscating keys from his vehicle and then using those keys to see if any fit any of the doors at his residence. Again, Jones was subject to a term and condition of supervised release that curtailed his right to privacy. The Court finds no impropriety in using Jones's keys on the doors of his residence.

portion of his Motion is DENIED.

*4. Conclusion*

Upon review, the Court does not find any of Jones's five arguments persuasive. Based upon Jones's non-compliant behavior, his probation officer was allowed to utilize a GPS tracker without a warrant. Stopping Jones and then searching his vehicle and residence were permissible under the terms and conditions of his supervised release. Jones cannot rely on his right to remain silent from over a decade ago. If he has any concerns about the chain of custody or process law enforcement used in testing the seized drugs, he can question witnesses at trial. But the Court will not suppress anything at this time. The Motion is DENIED in its entirety. And because the Court does not find any contested issues of fact, it finds a hearing is unnecessary. *Howell*, 231 F.3d at 620.

**C. Second Motion to Dismiss (Dkt. 63)**

*1. Introduction*

After his arrest on January 9, 2025, Jones was charged in Canyon County Case No. CR14-25-00802. The indictment forming the basis of this case was filed on February 11, 2025. Dkt. 2. Thereafter, on February 24, 2025, Canyon County dismissed its charges prior to any judgment being entered. Jones now alleges this sequence of events means the federal indictment must be dismissed under the doctrines of: (1) res judicata, (2) claim preclusion, (3) double jeopardy, and (4) due process.

*2. Legal Standard*

Federal Rule of Criminal Procedure 12(b)(1) allows a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on

the merits." "A motion to dismiss is generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017) (citation modified).

*3. Analysis*

As for res judicate and claim preclusion, the analysis is straightforward because there was no judgment on the merits in the Canyon County case; thus, those protections were never triggered. As Jones himself recognizes, "[i]f the [C]ourt decides . . . there wasn't a final judgment on the merits, then the inquiry is over." Dkt. 86, at 2.

The doctrines of res judicata and collateral estoppel apply to criminal and civil proceedings alike. *United States v. Cejas*, 817 F.2d 595, 598 (9th Cir. 1987). However, the doctrines are only triggered when the earlier suit "(1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (citation modified).

Here, there were no rulings at all in the Canyon County case, let alone a ruling on the merits. Rather, what happened with Jones is what often happens when a person is arrested and the operative facts implicate both state and federal criminal proceedings: the state dismisses its case so the matter can proceed in federal court.[11]

As for Jones's double jeopardy and broad Due Process arguments, the analysis is

[11] The Court will not address Jones's ancillary arguments relating to what might have occurred in Canyon County but for the dismissal because such is purely speculative. In like manner, that multiple agencies (and jurisdictions) were involved in both prosecutions was not erroneous. Joint task forces and collaborative efforts between state and federal law enforcement agencies and state and federal prosecutors are routine.

equally succinct. The Double Jeopardy Clause of the Fifth Amendment prohibits the imposition of multiple criminal punishments for the same offense at the same trial, unless Congress has expressed in the relevant statutes its intention that multiple punishments be available. *Garrett v. United States*, 471 U.S. 773, 779 (1985). It is well established, however, that a double jeopardy claim cannot be raised when an individual is prosecuted for the same act that violates the laws of dual sovereigns. *Heath v. Alabama*, 474 U.S. 82, 89-90 (1959). The double jeopardy clause limits consecutive state and federal proceedings only when federal prosecutors "so thoroughly dominate [] or manipulate [] the [state's] prosecutorial machinery . . . that the latter retains little or no volition in its own proceedings." *United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996).

In the instant case, nothing happened in the state case that would trigger double jeopardy concerns. Moreover, Jones has not persuasively shown Idaho state officials had little or no independent volition in the state proceedings. To be sure, Jones vaguely argues his probation officer impermissibly enlisted the help of other law enforcement personnel and that the federal government "turbo charged" the investigation and prosecution against him by using the broader terms and conditions of his supervised release as opposed to general privacy principles. Dkt. 63, at 8. But none of those actions are unconstitutional and none prevented the state of Idaho from doing what it deemed best under the circumstances. Again, Jones was subject to certain terms and conditions, the searches at issue complied with those terms and conditions, and collaboration between state and federal authorities is routine and constitutionally permitted.

Indeed, the state of Idaho could have pursued its prosecution of the more limited

charges—trafficking Cocaine and possession of a firearm—in the Canyon County case. The federal Government could have pursued a parallel prosecution for the remaining uncharged conduct such as the three controlled buys, the other unlawfully possessed firearms, the possession of the methamphetamine and fentanyl with intent to distribute, and the unlawful possession of a firearm in furtherance of a drug trafficking offense. But once Jones was indicted in federal court, Canyon County dismissed its charges (presumably) to promote judicial economy.

In short, there was nothing illegal or unconstitutional about the state of Idaho dismissing the Canyon County charges once the federal indictment occurred in the instant case. The Motion to Dismiss is DENIED.

**D. Second Motion to Suppress / Request for a Franks Hearing (Dkt. 64)**

*1. Introduction*

On January 9, 2025, Detective Chris Berrier of the Nampa Police Department provided an affidavit in support of a state court physical property search warrant for the house at 724 15th Avenue South.

In his affidavit, Detective Berrier outlined, among other things, that he personally observed Jones at that residence on September 17, 2024. Dkt. 64.1, at 4. Jones put the trash on the curb for pickup and then entered the residence through the back door.

Detective Berrier detailed how he observed Jones meeting with Sonya Robbins at the residence on November 14, 2024, and observed him discarding trash into the trash cans. Detective Berrier recounted how he observed Robbins leave the residence after meeting with Jones with a zipped backpack. *Id*. Robbins was then stopped by law enforcement, and

a drug detection dog alerted on her vehicle. During the search, the backpack was located, but it was no longer zipped shut. However, no drugs were found. Thirteen days later, Robbins' residence was searched pursuant to a search warrant and law enforcement found a methamphetamine pipe with methamphetamine residue. *Id*. at 5.

On November 20, 2024, with the help of a local trash company, Republic Services, Detective Berrier searched trash from the residence and discovered heat sealed bags, Ziplock baggies, and methamphetamine.

On November 26, 2024, Detective Berrier interviewed a source of information who identified Robbins as a local fentanyl dealer, identified Jones as her source of supply, and stated Robbins and Jones had an argument two months prior relating to three rifles.

On January 8, 2024, Detective Berrier again searched trash from the residence and located plastic baggies, including a gallon sized bag that contained methamphetamine. He also found an Amazon box with a shipping label made out to Laura with an address of 18159 Spicebush Ave., Nampa, Idaho. Detective Berrier knew the Spicebush address was Jones's home address where he lived with his girlfriend Laura Rodriguez. *Id*. at 6.

Based on his training and experience, Detective Berrier concluded all of his observations supported the conclusion that Jones was involved with illicit drug use and/or sale and that drugs or drug paraphernalia would be found at the residence. *Id*. at 6.

Jones argues Detective Berrier deliberately or recklessly omitted material facts from the affidavit and, but for those errors, the judge would not have signed off on the warrant. Specifically, Jones criticizes Detective Berrier's (1) summary of the trash searches, (2) failure to identify the house as a daycare facility, and (3) failure to note a confidential

informant was receiving a benefit for cooperating. He requests a *Franks* hearing to challenge Detective Berrier's affidavit.

*2. Legal Standard*

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court held that a search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge. The Fourth Amendment requires an evidentiary hearing if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Id*. "Allegations of negligence or innocent mistake are insufficient." *Id.* at 171. Furthermore, conclusory "allegations of deliberate falsehood or of reckless disregard for the truth" are also not enough; rather, the allegations of deliberateness or recklessness "must be accompanied by an offer of proof." *Id.* at 171.

To obtain a *Franks* hearing, a defendant's motion must meet five requirements:

> (1) [T]he defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations, (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. Dicesare*, 765 F.2d 890, 894–95 (9th Cir. 1985).

Affidavits are presumed valid. Accordingly, the burden of showing otherwise is high. *Franks*, 438 U.S. at 171. The Supreme Court requires a *substantial* showing from the defendant, in part, because "if such hearings were conducted routinely . . . , they would be

misused by defendants as a convenient source of discovery." *Id.* at 167.

Even if the defendant makes a substantial showing "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included [in the affidavit]," a hearing still may not be required. *Id.* at 155, 171–72. "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72.

Probable cause for a search warrant exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

*3. Analysis*

a. Trash collection

Jones first alleges Detective Berrier deliberately or recklessly omitted the fact that the Republic Services employee trespassed onto the property to empty the trash bins that were later searched. He bases this argument on an interview with a Republic Services employee who stated trash cans must typically be placed "on the curb" for pickup (Dkt. 64-5) and a photograph that shows the residence has a fence around it which leaves only a few feet between the fence and the curb for the placement of trash cans (Dkt. 64-6) and the trash cans don't appear to be truly "on the curb."

To begin, it is not at all clear that anyone trespassed onto the residence. The house is small, the fence around the house is only a few feet from the curb, and there is no sidewalk on that side of the property. Jones postures that, because of this physical setup,

*any* entry onto the property could constitute a trespass. But with such a small lot, there is no other location a trash can could be placed for pickup *except* outside of the fence near the curb or in the street itself. Jones does not argue he ever placed these trash cans in a different location other than outside the fence, but simply suggests they were not actually ready for pickup that day and Republic Services trespassed on the property. This strains credulity. With little more than Jones's self-serving hypotheticals, the Court can only assume the trash cans were placed there for pickup on that day. Assuming that was the case, no trespass occurred and Jones had no expectation of privacy in the contents of the trash cans.

Setting aside any interpretation of trash can placement and what that means for trespass purposes, all Detective Berrier said in his affidavit was that he had observed the Republic Services employee "retrieve 1 trash can and empty it" into the truck. Dkt. 64-1, at 5. There is nothing about this statement that is misleading or false. And even assuming arguendo that this statement was somehow false, there was ample other evidence in Detective Berrier's affidavit supporting the application for a warrant.

In like manner, even if Detective Berrier had said Republic Services trespassed onto the property to retrieve the trash—which he had no reason to say—such does not automatically mean the reviewing judge would have denied the warrant. As with most of his arguments here, Jones's alternative interpretation of certain facts and evidence or his mere supposition of what might have been are insufficient to justify a *Franks* hearing.

b. <u>Daycare facility</u>

Jones next contends Detective Berrier deliberately omitted the fact that the residence

was used as a daycare facility despite knowing that fact.[12] Jones does not necessarily complete his thought here, but the implication seems to be that, if the reviewing judge had known the residence was a daycare, the warrant would not have issued for some reason.

This is pure speculation. Jones thinks the inclusion of information about the daycare would have swayed the reviewing judge *against* issuing the warrant. But as the Government points out, it is just as likely the information could have gone the other way. The notion that a daycare was being used as a hub for the distribution of illegal drugs might have heightened the need for a warrant. The Court finds Jones has not met his burden with regard to this issue to receive a hearing.

c. Confidential Informant

Finally, Jones argues that Detective Berrier deliberately and recklessly omitted the fact that a confidential informant "at or near the time of the search warrant . . . had a potential criminal case go uncharged because she was a cooperator." Dkt. 64, at 5.

To begin, Detective Berrier's affidavit included a section entitled "Cooperator Statement." Dkt. 64-1, at 2. That section outlined a cooperating source who "is a paid informant" and has a criminal history. *Id*. Importantly though, this section outlines that the source "is not working for consideration on any law violations." *Id*.

Jones seems to think he knows who the source is. And he alleges she received favorable treatment in her own legal matters because she helped law enforcement here.

[12] Jones also suggests as part of this argument that there was insufficient evidence to tie him to the residence because it was a place of business. First, that the residence was a place of business (supposedly) does not mean Jones could not have any connection to it. Second, Jones was repeatedly observed coming and going from the residence, meeting with people at the residence, and placing items in the trash. This was more than enough to tie him to the residence.

However, there is *zero* credible information anywhere in the record to suggest this is the case. But even assuming the source received some benefit for cooperating—which would be consistent with the Court's understanding of how the relationship between law enforcement and confidential sources work—it would be immaterial because the affidavit does not mention, much less rely on any information or statements made by the source.

Simply put, the source is not quoted or mentioned at all in the affidavit beyond the cooperator statement section. Because the affidavit does not contain any information about what the source did or knew in this case, it is irrelevant what benefit he/she may have received, if any.

Jones is not entitled to a hearing to explore this unsubstantiated theory.

d. Conclusion

The bottom line is that Detective Berrier's affidavit was sufficient. Jones's theories that there was a trespass or that the information about the daycare or the confidential informant's cooperation would have changed the outcome is not enough to warrant a hearing. He has identified no falsehoods, no deliberate or reckless omissions, and made no offer of proof supporting any claim. And again, even if the Court were to excise those portions of the affidavit Jones challenges, there was still sufficient probable cause for the reviewing judge to conclude criminal activity was underway and issue the search warrant.

## V. CONCLUSION

For the reasons outlined above—and in the accompanying sealed order—the Court finds Jones has not carried his burden as to any of his motions or requests. There are no

truly contested issues of fact that need to be fleshed out at a hearing.[13] Accordingly, all Motions are denied.

## VI. ORDER

1. Jones's Motion for Return of Property (Dkt. 61) is DENIED.
2. Jones's Motion to Suppress (Dkt. 62) is DENIED as to each of the five requested areas of examination.
3. Jones's Second Motion to Dismiss (Dkt. 63) is DENIED as to all four bases for questioning the state court dismissal of its charges.
4. Jones's Second Motion to Suppress / Request for *Franks* Hearing (Dkt. 64) is DENIED as he has presented no information to credibly question the sufficiency of Detective Berrier's affidavit.
5. The previously scheduled hearing on the various motions (Dkt. 89) is VACATED. However, the Court will hold a status conference at that same time.
6. Jones's Counsel's Motion for Status Conference (Dkt. 91) is GRANTED.

DATED: September 2, 2026

David C. Nye
U.S. District Court Judge

[13] While the Court will not hold a hearing on any of Jones's Motions, it will hold a status conference—as requested by Jones's counsel—to ascertain how Jones's wishes to proceed in this case. Jones has refused to meet with his current attorney on at least two occasions. *See* Dkt. 91-1. With trial fast approaching, it is imperative that he communicate with his attorney so that adequate preparations can be made.